[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[MEMORANDUM OF DECISION]
[Nature of Pleading:]
By petitions filed 2/11/93, and amended 11/2/93, the Department of Children and Families (DCF) seeks to terminate the parental rights of Dawn Sn. in her two daughters, Chrystal Sn., born 2/12/86, and Tasha Sa., born 7/13/87, alleging all four of the nonconsensual grounds for so doing as set forth in subsection (b) of Section 17a-112 of the Conn. Gen. Stats. (Rev. 1993) applicable to children previously committed to the the state as neglected or uncared for, as were these children four years earlier. The petitions seek, too, to terminate the parental rights of Santos R. and Pedro Sa., biological fathers of Chrystal and Tasha respectively, both of whose acknowledgments of paternity were stipulated to the court by their attorneys at a preliminary hearing on 10/20/93. Service by publication on both acknowledged fathers, whose whereabouts were unknown at the commencement of these proceedings, was confirmed at the initial hearing on 3/2/93. Dawn was served at Niantic, where she was then confined, and appeared at the initial hearing and at all subsequent hearings with counsel. Separate counsel were appointed to represent each of the absent fathers, neither of whom appeared at any subsequent hearing. The attorney for Santos R. was, however, in later telephone communication with his client who indicated his willingness to consent voluntarily to the termination of his parental rights. His written consent, duly executed, was CT Page 4315 submitted to the court after the evidentiary hearings were concluded. In a special hearing held on 3/2/94, the petitioner amended her petition to allege consent by Santos R. and the consent submitted was found to be voluntarily and knowingly executed and thus a valid ground for terminating his parental rights in Chrystal.
In the preliminary hearing, three trial days in November of 1993 were agreed upon, and all parties stipulated that the adjudicatory date would be the date of amendments to these petitions that were to be filed before the first trial date. Advancing the adjudicatory date to the date of last amendment is consistent with Sec. 1042.1(4) of the Practice Book, as amended affective 10/1/93, but the stipulation was entered into in view of the pending appeal in the case of [In reRomance M.], 30 Conn. App. 839 (1993).
After the petitioner rested, the mother moved to dismiss for failure to establish a [prima facie] case. Her motion was granted as to one of the grounds pleaded on both petitions: the absence of any ongoing parent-child relationship, notwithstanding unrefuted clinical evidence that whatever relationship existed between mother and daughters was not ". . . the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." (Sec. 17a-112, subsection (n)). Dismissal was required on the authority of [In re Jessica M.],217 Conn. 459 (1991), and [In re Valerie D.], 223 Conn. 492
(1992) interpreting the operative language to preclude finding such ground whenever the child has any "memories" or "feelings" for a parent that are not wholly negative. The mother's motion to dismiss was also granted as to Chrystal on the pleaded ground that she had ". . . been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his [sic] physical, educational, moral or emotional well-being" since the state had offered no evidence of such parental denial in the five years since Dawn had lost custody of the child. Decision was reserved on this ground as to Tasha, however, because of the introduction of evidence of ritual or satanic sexual abuse which came to light only after that child's commitment in 1989 and which could be accountable for her fragile emotional CT Page 4316 condition on the adjudicatory date. Dawn's motion to dismiss was denied as to both children on the alleged grounds of abandonment and failure to rehabilitate.
The respondent mother then presented evidence on two trial days, concluding on 12/17/93, and was given to 1/26/94 (later extended, with court permission, to 2/2/94) for the filing of a trial memorandum, with all other parties given one week for the filing of any corrections thereto. Although the mother's trial memorandum was not received until 2/4/94, it was accepted for consideration by this court. A purported "Motion for Reconsideration", appearing as topic III in that memorandum, was not considered as such since filed in improper form more than six weeks after conclusion of trial. P B. Sec. 1055.1, subsections (2) and (3).
The matter was continued, with regard to Santos' R. only, at request of his counsel, for the purpose of presenting his written consent to the termination of parental rights and the amendment of the petition regarding Chrystal to conform with this proof.
[Facts]
Evidence offered in five trial days concluding on 12/17/93, interpreted in the light of the prior court records concerning these children, of which judicial notice is taken, supports finding of the following facts:
Chrystal was two and a half years old, Tasha barely one and a baby sister, now deceased, just a month old when their mother was first arrested on 8/2/88 for leaving the three little girls without adult supervision for a period of time long enough for the police to be called. DCF (then known as the Department of Children and Youth services, or DCYS) did not bring the matter to court at that time but rather referred the mother to counselling (both fathers being absent from the home) and entered into a service agreement with her on 9/7/88. A month later, however, on 10/3/88, the police again found the three children unattended and again arrested their mother This time Dawn signed a voluntary permission to place her children and DCF licensed her parents to act as their foster parents. Proceedings concerning the infant were subsequently discontinued following her death of Sudden Infant Death Syndrome in December of 1988. CT Page 4317
Petitions alleging neglect were filed on 11/28/88 and in the initial hearing on 3/2/89, both Dawn and Pedro appeared with separate counsel, admitted the allegations of neglect and agreed to the commitment of the children pursuant to subsection (d) of Sec. 46b-129 of the CGS. The original commitment entered on that date was subsequently extended four times, most recently effective 9/2/93 to run, unless sooner ended, until 3/2/95. Chrystal's father, who had appeared at the originally scheduled plea hearing on 2/9/89 but was unable to attend the continued date on 3/2/89 because he was then serving in the navy, indicated on the earlier date that he did not oppose the petitioner's plan for his daughter.
Although the maternal grandparents, with whom the children had been placed following their mother's arrest in October of 1988, had asked for their removal on 1/11/89, by the time of the hearing on 3/2/89 they expressed their willingness to have the children returned to their care, which occurred the following day. Unfortunately for these children, then three years old and not quite two respectively, three months later the grandparents again requested their removal and on 6/5/89 they returned to the foster home — their fifth placement in eight months.
At the time of commitment, the state's plan was to reunite the girls with their mother. To facilitate this end, the court spelled out expectations in writing at the time of commitment as a guide to the mother in achieving this goal. These included visiting, counselling (both individual and for parenting skills) and maintaining contact with DCF.
By the end of 1989 — a full year after the children were first placed out of their mother's home — DCF filed petitions seeking to terminate her parental rights so that permanent homes could be secured for these girls in view of Dawn's failure to evidence any signs of necessary rehabilitation: She had involved herself in no counselling program for herself or for her parenting skills and had rarely visited the children. Five months after initiating the termination action, the petitioner inexplicably moved for a psychological evaluation of mother and children. The evaluation was received by the court on 8/16/90 (State's Exh. B) and the next day the court set a trial date certain for 10/17/90. On that date, however, no trial was held, apparently because the CT Page 4318 grandparents, more than a year after last requesting the girls' removal, had reentered their lives and were again asking to be considered as their caretakers. Based upon this offer and upon a supplemental evaluation by Dr. Robert Meier, the court-appointed clinical psychologist who had earlier seen Dawn and the children, the petitioner moved to dismiss the termination petitions without findings or prejudice. New expectations were spelled out by the court and further evaluations of the grandparents ordered in view of possible impediments to their being approved as long term caretakers because of the maternal grandfather's criminal record and history of alcohol abuse.
Little more than a year later, this plan, too, had aborted: The grandparents failed to attend the counselling sessions that Dr. Meier had recommended as a condition precedent to extending visitation prior to the children's placement in their home. In an in-court review on 11/19/91, with the maternal grandparents once again — this time finally — removed as a permanency resource, DCY did not reactivate the termination petition of the previous year but rather reinstated its original plan of two years earlier: Reunification with their mother. At that time, Dawn was out of prison on Supervised Home Release (SHR) and expressing her willingness to comply with newly spelled out expectations including drug treatment, compliance with the conditions of parole and SHR, and consistent visitation. In the hearing on the third extension of the children's commitment on 2/14/92 these expectations were reviewed and refined and, again, agreed to by the mother. Four months later, Dawn filed for revocation of commitment; four months after that, on 10/6/92, she withdrew that petition; four months after that, DCF filed the instant petitions seeking, as it had more than three years earlier, termination of parental rights so that these children, after now more than four years in foster care, could secure permanent homes through adoption.
In the three years that had elapsed between the filing of these two termination petitions, the children's placements continued to be unstable. After both began acting out sexually in the first foster home, they started counselling. In April of 1990, at the request of the foster parents, Chrystal was moved to the J. foster home, where she remains to date. On 8/1/90, during the first psychological evaluation ordered by the court in connection with the original CT Page 4319 termination petition, the psychologist learned from Tasha that the visible bruises on her body had been inflicted by the foster parents — an observation that apparently had not been made by DCF staff — and she was transferred, that day, to the B. foster home. At that time, Pedro Sa. offered his mother in Puerto Rico as a possible permanent placement for Tasha. At the request of DCF, a brief study was conducted in Puerto Rico of the home, and on 10/6/90 a report was filed favorable to Tasha's placement there, notwithstanding the age of the grandparents (in their sixties) and their limited means (solely Social Security). By this time, however, since the maternal grandparents had reappeared in the children's lives as possible permanent caretakers, any plan to separate Tasha from Chrystal in order to place her in Puerto Rico with grandparents she did not know was put in reserve, in case placement with maternal grandparents proved impossible. When such placement did, indeed, prove impossible, the paternal grandparents were not considered since the plan had then reverted to reunification of both sisters with their mother. Pedro had not renewed the offer of his parents since 1990.
Soon after the extension hearing of 2/4/92, when the latest expectations for Dawn were reviewed and approved, DCF learned of suspected sexual abuse of Tasha in her present foster home, and in March of 1992 she was again moved, this time to the X foster home, where she remains to date.
At no time did Pedro Sa., even during periods when he was not incarcerated, offer any plan for Tasha other than to suggest his parents in Puerto Rico in 1990. At no time did Santos R. offer any plan at all for Chrystal. Pedro visited Tasha on occasion, and was always observed to have acted appropriately with her; Santos had never visited or requested any visitation with Chrystal.
During the 21 months between the last court hearing in which expectations for reunification of Dawn with her daughters were articulated (2/4/92) and the adjudicatory date for this termination action (11/2/93), Dawn's compliance with those expectations was less than marginal: A month after appearing in court on 2/4/92, she tested positive for drugs and was reincarcerated (March-April, 1992). During five months of freedom, April to September, 1992, she rarely saw her daughters and participated in no form of treatment. She was reincarcerated for six months, starting in September of CT Page 4320 1992, on new drug charges. Released in March of 1993, she remained free for only three months before being returned to prison for 25 days for violating conditions of SHR. Released again in July, she remained free for less than one month before being returned to prison for another violation of SHR conditions. She continued to be confined in prison to the final day of trial. In summary, in those 21 months preceding the adjudicatory date for these petitions, Dawn was out of prison for only 10 months, each period of freedom shorter than the last. During two of those 10 months, DCYS did not know where she was living. Although given a visitation schedule when not incarcerated, she complied rarely and irregularly; given references to treatment programs, she never went beyond making initial appointments; she never obtained housing in her own name, although referred by DCF to the housing authority, living instead either with her mother or at the Hooker Hotel which DCF deemed inappropriate even for visits. The only employment she secured during this period was at McDonald's where she worked one day before leaving after an argument with the manager. When Tasha moved to her present foster home in March of 1992, the social worker offered to drive Dawn there for visits on request, but Dawn said she preferred to go on weekends and would arrange her own transportation. When a schedule for these was established, she failed to appear for more than half of the visits. Visiting with Chrystal was facilitated by the fact that Dawn, when not incarcerated and the foster family attended the same church. Dawn was given permission to spend part of each Sunday with her daughter, but failed to come to the church on many occasions: During her last period of extended freedom, March to June 1993, she only saw Chrystal twice. When asked by the social workers why she failed to visit regularly or to follow through on the counselling referrals, Dawn's usual response was that she "forgot" or had "something else to do." (Testimony of Social Worker Hernandez 11/17/93; mandated social study, State's Exhibits D and E.) Telephone contact with the girls was more frequent when she was incarcerated than when she was free: Chrystal's foster mother testified, "I'm not sure she called at all" when she was not in Niantic. (Testimony of foster mother J., 11/3/93). Visitation with Tasha was suspended 9/15/93 on the recommendation of the child's therapist.
The only testimony offered by Dawn, other than her own, was from Niantic personnel. Both Corrections Rehab Officer DeSantis, who had only met the mother three-months before CT Page 4321 trial commenced, testified from Corrections Department records that Dawn's behavior over the preceding four years, had improved during her incarcerations at Niantic. DeSantis also testified that Dawn had attended 50% of scheduled meetings of a mothers' support group which met at the institution from April to June of 1992 and again from January to March of 1993 She had attended all of the scheduled meetings of a parent education group at Niantic in 1991, but only half of the scheduled meetings of a subsequent "module." while she had participated as a "caregiver" in a Sesame Street program at Niantic in fourteen months of incarceration she had attended only 11 of a possible 28 bi-weekly meetings of Narcotics Anonymous available in the institution.
Niantic Social Worker Beverly Herbert had known Dawn since 1989 or 1990 in connection with arranging visits with "her children while incarcerated. She had observed a number of visits with Chrystal who always seemed happy to see her mother. She also observed Tasha on visits during which she seemed withdrawn and quiet, in contrast to her older sister. Ms. Herbert testified to seeing an improvement in Dawn since 1989: She seems more at ease now, listens more and is more willing to discuss her problems and deal with her feelings instead of losing control. The only plan Dawn had shared with Ms. Herbert for her children was to bring them, upon her release from Niantic, to live at the home of her parents — the same grandparents who had earlier removed themselves from consideration as the girls' caretakers.
Testifying on her own behalf, Dawn introduced the discharge summary from her brief stay at Perception House (Respondent mother's Exh. 4) in which was stipulated a history of addiction to heroin with a poor prognosis for the future. Dawn confirmed her prior addiction to cocaine and heroin, having last used cocaine in 1989 and heroin in 1993. She acknowledged that upon her next release from Niantic it would be best to leave her daughters in foster care: "I'm not ready yet . . . I need to get myself together before I can take anything else." Contrary to what she had told Ms. Herbert, Dawn testified that she had her own apartment in Storrs awaiting her, although the rent was currently paid by her boyfriend, later identified as E.C., a recovering addict. Dawn confirmed her involvement in a number of different addiction treatment programs when not incarcerated and gave a variety of excuses for her failure to follow through on any of CT Page 4322 them. Acknowledging a five year drug problem, she estimated it would take most of a year after release from Niantic to "beat the drugs" which was her primary goal before seeking return of her children. She planned to make a home for them with E.C., a current boyfriend who had not yet met her children. Asked why things would be different this time from the many times in "the past four years that she had discharged from prison, she responded that previously she had complied with treatment requirements because it was required by "others"; this time she would be doing what had to be done to remain drug-free "for myself."
[Clinical Evidence]
Clinical psychologist [Robert Meier] evaluated the family on court orders in August of 1990 (State's Exh. B) and again three years later (State's Exh. C). In the earlier evaluation, after less than two years in foster care, Dr. Meier found attachment to their mother "relatively minimal, her attitude toward [her] critical and negative." Two years later he found the relationship essentially unchanged (testimony of 11/3/93). Tasha, favored by her mother in 1990, continued to be the favored child three years later. In 1990 Dr. Meier had found Dawn, despite incarceration and loss of her children, showing "little ability to rehabilitate" (State's Exh. B, p. 12). He predicted at that time that "[s]he will be unable to care for her children for several years and even at that time her ability to rehabilitate is unclear." (Id., p. 12-13.) In his testimony, Dr. Meier found that this had not changed in the more than three years between evaluations, during which she continued to use or sell drugs, admitting that she had last used and sold drugs in June of 1993, shortly before beginning her most recent incarceration.
After five years away from their mother, Dr. Meier found both girls evidencing special educational, emotional and behavioral problems. (Testimony of 11/3/93.) While he noted affection between the girls and their mother, he found Dawn unable effectively to set limits when the girls acted hostile or jealous, leading to a deterioration of behavior during the clinical interview. He concluded that the relationship between mother and daughters was "about the same" as in 1990. Dr. Meier did not see reunification with the mother as a reasonable expectation finding her incapable of providing for CT Page 4323 the children's basic needs, and even more clearly unable to meet their special needs. These had improved with Chrystal due to her stable foster placement, but found Tasha more needy than three years earlier, evidencing a "major emotional disorder" with multiple symptoms, possibly psychotic. Because of her continuing substance abuse problem, which had not been persistently addressed in any rehabilitative program, he found Dawn incapable of meeting Tasha's special needs. In his opinion, this prediction would not change unless Dawn could demonstrate sustained sobriety for a full year after her release from prison. After five years in foster care, he did not recommend that these needy children should wait longer than they already have for the possible rehabilitation of their mother, particularly since the prognosis for any sustained rehabilitation remained poor based upon her level of denial, an established pattern of discontinuing treatment, and the continued use and selling of drugs except during her increasingly frequent periods of incarceration.
[Joann Martin], a social worker with Elmcrest Psychiatric Hospital, had worked intensively (four afternoons a week) with Tasha for the month preceding her testimony of 11/3/94. She concluded that Tasha had been exposed to Satanism in the past, and was evidencing, as a consequence, a multiple personality disorder. She recommended that Tasha not be returned to her mother until it was proven that her exposure to Satanic ritual abuse had not occurred while living with her mother, and that visits should not be resumed since they might trigger self-destructive behavior. Ms. Martin acknowledged that she could not determine with any certainty whether the abuse which produced Tasha's terrifying stories of Satanism and physical and sexual abuse had occurred in her biological mother's home or in either of the two foster homes where physical and sexual abuse had earlier been confirmed. She could not eliminate Dawn's home, however, since Tasha identified her mother as a "ghost" and expressed fear of her. She ascribed some significance to the fact that Tasha had called her mother "Natas" which is Satan spelled backward. She recommended continuing with the intensive day treatment for a few months, while continuing with her primary weekly therapist. She did not find it remarkable that Tasha had been exposed to the Satanic abuse while her older sister evidenced no sign of such experiences
[Celeste Chartier], a Masters Degree Counsellor with a CT Page 4324 community family service agency, is responsible for recruiting, training and supervising special "treatment foster homes." Tasha was referred to her agency a year before testifying on 11/10/93 for admission to her program. Diagnosed then as suffering from Post Traumatic Stress Disorder (PTSD), her behavior in her then foster home was deteriorating: She was acting out sexually and had behaved violently to other children in the home. On 11/12/92 Tasha was placed in the X specialized foster home where she was the only child. During the first five months of that placement, Tasha was taken for monthly visits to her mother in Niantic, as well as having phone calls from the prison. When the mother was released from March to July of 1993, Tasha received no telephone calls but her mother failed to appear for the first and only visit scheduled in the DCF office. During a subsequent visit in Niantic, Tasha clearly recognized her mother, but became increasingly agitated, panicky and hyperactive, necessitating an early termination of the visit.
Two months after moving to her present foster home, Tasha began to disclose to her foster mother episodes of past abuse, indicating a high degree of trust in the foster mother. Tasha expresses love for the foster mother and a desire to remain in this home while displaying ambivalence in her relationship with her mother: She appears excited and anxious to see her mother, but at the end of visits she appears anxious to leave. While unclear "as to the reason, Tasha clearly connects terrifying experiences in a ritualistic, abusive church with her biological mother, and verbally connects sexual abuse with Dawn.
After her return to prison in July of 1993, Dawn called Ms. Chartier seeking contact with Tasha. Asked why contact had ceased during her three months of freedom, she responded that she had lost the telephone number and that her social worker had failed to return phone calls. After this call, telephone contact with Tasha was reinstated starting July 21, 1993. Tasha's reactions varied. At first excited, she began to exhibit negative behaviors: Fighting with her peers, acting increasingly clinging toward the foster mother, and stealing. By September, on the recommendation of her two therapists, all contact, including telephone, was suspended.
Ms. Chartier agreed with the diagnosis made by Martha Roberts that Tasha exhibited "in grand measure" significant CT Page 4325 symptoms of Post Traumatic Stress Disorder (PTSD): Flashbacks, responding to interior sounds, fearfulness, sleep disorders, multiple personalities. Recommended treatment for Tasha was to remain in her present foster home, continuing the present therapies in which she was engaged, and involvement in constructive activities both in and after school. Renewed contact with her mother was counterindicated at the time of Ms. Chartier's testimony, based upon Tasha's manifesting feelings of being unsafe with her mother. Contact should be reinstituted after confrontation in a therapeutically supervised milieu to ensure that Tasha's safety is not threatened, but Ms. Chartier could not estimate when this could begin.
[Martha Roberts], a clinician with United Services and an expert in treating sexually abused children, had worked with both girls for extended periods of time. Chrystal periodically acted out sexually and evidenced problems with "boundaries" — failure to respect the belongings and persons of others, lying, stealing. Tasha is more deeply disturbed with a dissociative disorder "indicative of severe trauma" from "overwhelming abuse." Dawn had called for an appointment with this therapist on a single occasion but failed to appear or to call either to explain her failure or to reschedule. Ms. Roberts noted correlation between contact with their biological mother and increased acting-out by both girls. This witness recalled that the children saw their mother regularly only when she was incarcerated: "When she's been out of prison there's been no contact." Because irregular contact is not beneficial to either child, "I would prefer that they not be visiting." Both girls needed an extended period of security in which to heal from their past experiences. Ms. Roberts found no benefit to either girl from reunification with their mother, predicting "disintegration" if either should be returned to her care. After five years of living apart from Dawn, both girls now refer to other women as "mom"; neither should be required to wait longer than this for reunification with her. While unable to specify when the abuse occurred that resulted in these reactions by the girls Ms. Roberts predicted that they would each need treatment for the indefinite future. Visits for Tasha to her mother in prison were stopped on Ms. Roberts' suggestion after confirmation of a multiple personality disorder and strong evidence of PTSD. In 17 sessions with Chrystal, and more than 60 with Tasha, the older child had mentioned her mother on a CT Page 4326 single occasion and Tasha had never done so. While they know who she is, Ms. Roberts found little or no relationship with their mother: Reunification with Dawn would thus be "reunification with a stranger." Both children, but particularly Tasha, will need a "special degree" of good parenting to compensate for their early deprivations. She found no sign that Dawn would ever be the person to provide this degree of good parenting: "Just because someone gives birth to a child does not make them a mother."
[Mandatory Findings]
Except in the case of Santos R. who has consented to the termination of his parental rights, before such termination may be considered for Dawn or Pedro, the court must consider the following factors as set forth in subsection (d) of Sec.17a-112, as amended by P.A. 93-193 effective 10/1/93:
(1) DCYS made repeated efforts to involve Dawn in counselling, both for her deficient parenting skills and for her continuing problem with substance abuse. During her brief periods when not incarcerated, the mother sustained none of these. DCYS also offered to facilitate visitation, but those offers were refused. During her repeated periods of incarceration, DCYS had no ability to offer such services. While she did take advantage of drug and parenting programs in Niantic, she evidenced no ability to sustain whatever she learned from them when at liberty.
(2) DCYS (DCF) has made reasonable efforts, under the circumstances of Dawn's life, to reunite this family as required by the federal Child Welfare Act. Indeed, from the point of view of the children, these efforts could be perceived as going beyond the reasonable, to the detriment of the children's need for — and, under this Act, right to — permanency. DCYS properly initiated the first termination action in 1989 after the children had been placed out of Dawn's home for over a year with no manifested evidence of rehabilitation. That action was withdrawn when the on-again, off-again maternal grandparents renewed their bid as the girls' caretaker. It was not reinstituted, however, when these grandparents proved CT Page 4327 to be no more a permanency resource in 1990-1992 than they had been in 1988 and 1989. Instead, Dawn was given yet a further opportunity to rehabilitate. The state's efforts were unquestionably reasonable from Dawn's point of view; they exceeded the necessary bounds of reasonableness from that of these children.
(3) No court orders were entered in this matter other than to cooperate with psychological testing, which Dawn has always done. While not orders, the court's expectations for reunification were repeatedly spelled out and agreed to in hearings over the course of nearly three years. Except when incarcerated, when she was in partial compliance, the mother has complied with none of the essential expectations: Regular visitation; drug treatment; psychological counselling; parenting programs.
(4) The feelings and emotional ties of each child with respect to Dawn were testified to exhaustively by clinical and other professional witnesses. Chrystal recognizes her mother as one of her "moms" but displays ambivalence toward visitation; Tasha recognizes her mother as "Mama Dawn", one of the "mamas" who involved her in the terrifying experiences she recounted from the satanic ritual abuse connected with a church, and fears her. Both children regard their current foster mothers as "mom", and both would suffer serious psychological damage if separated from them.
(5) At nearly eight and six-and-one-half, Chrystal and Tasha, after five years of continuous foster care, are both in critical need of permanent placements, and can wait no longer for the uncertain possibility that their mother, following release from her current incarceration, will become able to sustain the necessary degree of sobriety and stability to meet their ordinary and special needs.
(6) Dawn has made little effort, when not incarcerated, to adjust her circumstances, conduct or living conditions to make it in the best interest of either child to return to her home in any foreseeable future. The efforts she has made during her increasingly frequent incarcerations give no assurance that they could be maintained when Dawn is at liberty. Her visits with both girls have been CT Page 4328 irregular and infrequent during most of the periods that she has been out of prison. Telephone calls were rarely made except when scheduled by the staff at Niantic Prison.
(7) Nothing prevented Dawn from maintaining a meaningful relationship with either child except for her own drug addiction and disorganized personal life. The suspension of contact with Tasha in September of 1993 was not unreasonable but rather was the result of a clear recommendation of her therapists who were then dealing with a combination of grave symptoms emotional disturbance bordering on psychosis.
As to a father, such as Pedro, whose whereabouts have been long unknown and who has had no contact with either the child or her caretakers for many years, all of these findings apply with even greater force: DCF can make no efforts to reunite such a father with his child; court expectations cannot be addressed to such a father; there is no evidence that he made any effort to adjust his circumstances so as to permit reunification with his daughter; the obvious impediment to the maintenance of any relationship, much less a meaningful one is the father's total absence from the life of the child Findings (4) and (5) are even more applicable to an absent father than they are to Dawn: Tasha could have no feelings memories or ties with Pedro Sa. after his absence for most of her young life. And at the age of six, even without the many serious psychological problems she is currently manifesting, the introduction of a stranger as her father at this time would be of no possible benefit to the child.
[Adjudication — on facts as of 11/2/93]
1. As to Santos R.:
The consent submitted by his attorney to the court on 3/2/94 was found to have been made voluntarily, knowingly and with full awareness of its legal consequences. It is hereby accepted and found to be a valid ground for the termination of his parental rights in Chrystal. While no further finding is required, it is to be noted that the complete absence of Santos R. from his daughter's life since her original placement in foster care five years earlier would, without more, provide clear and convincing proof of abandonment, CT Page 4329 failure to rehabilitate and absence of parent-child relationship, even under the reading of that ground required by [In Re Jessica M.], 217 Conn. 459 (1991) and [In Re ValerieD.], 223 Conn. 492 (1992). Lacking any offer of proof that Chrystal has been denied any necessary care and attention during her five years of placement, the "acts of parental omission or commission" ground must necessarily be [dismissed].
2. As to "Pedro Sa.:
The absence of Pedro Sa. from Tasha's life for two or more years prior to the adjudicatory date is, without more, grounds to find (1) abandonment, in its common-law as well as statutory sense; (2) failure to rehabilitate in that Pedro has never offered any plan for the care of his child other than the home of his parents, which offer has not been repeated since 1990; (3) absence of parent-child relationship and, given Tasha's fragile psychological state, the unlikelihood that such relationship could be established or reestablished within a period of time that would not be detrimental to the child. As with the father of her half-sister, in the absence of any evidence that Tasha has been denied any "care, guidance or control necessary for her physical, educational, moral or emotional wellbeing" by any acts or omission or commission by Pedro, this ground for terminating his parental rights must be [dismissed].
3. As to Dawn:
The mother's motion, made at the end of the presentation of the state's case, to dismiss the ground of "acts of parental omission or commission" as to Tasha, on which judgment was reserved is hereby granted. While the state offered evidence that the child had been exposed to satanic or ritual abuse, the evidence that this could have occurred prior to the age of 15 months, when she was removed from Dawn's care, is far from clear and convincing. Therefore, this ground is [dismissed].
Abandonment is also dismissed as grounds for terminating Dawn's parental rights. While it is undeniable that during the increasingly infrequent periods of her nonincarceration, Dawn failed to evidence a "reasonable degree of interest, concern or responsibility", in the 12 months preceding the adjudicatory date, during most of which she was incarcerated CT Page 4330 in Niantic, her efforts to secure prison visits and use her privileges for weekly telephone calls, while not perfect, can be seen as reasonable under all the circumstances. Since the evidence falls short of being clear and convincing that Dawn failed to show a "reasonable degree" of interest, concern or responsibility" during all of this 12 months period, this ground to terminate her parental rights is [dismissed].
Failure to rehabilitate: — The petitioner has established by far more than the requisite standard of clear and convincing proof that Dawn, whose two daughters were found to have been neglected or uncared for in a prior proceeding "has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child[ren], [she] could assume a responsible position in the life of the child[ren]." This case has an appalling consistency from the first referral of the mother for leaving her three small children unattended in August of 1988, to her return to Niantic in July of 1993, nearly five years later, because of her inability to comply with the rules of her Supervised Home Release. She continued to use and sell drugs, by her own admission to Dr. Meier, throughout most of those five years, and she has never followed through consistently with any programs of treatment, either in or out of the institution. She has demonstrated no ability to sustain herself in the community for more than a few weeks without again running afoul of the criminal justice system. Her testimony that now, for the first time, her attitude has changed and therefore she predicts an ability to remain in treatment and sober upon her next release from prison, is too little and too late: She has done nothing to demonstrate to Dr. Meier or to the court that this "changed" attitude is genuine or, if genuine, can be sustained for any period of time following her release from prison. Even if it proves to be genuine Dawn agrees with Dr. Meier that she would have to demonstrate her ability to maintain sobriety outside of the institution for a period of time that the psychologist estimated should be one year. After five years in foster care, during which their mother showed no sign of rehabilitation other than this self-serving verbalization, these children should not be asked to wait until they are eight and nine years old for the permanent home they need so desperately, "considering the age and needs of the child[ren]". CT Page 4331
[Disposition — on Facts as of 12/17/94, The Final Date of Hearing]
Only six weeks elapsed between the date of adjudication on amended pleadings and the final trial date. Dawn remains in prison. Her release date remains unknown. Her plan upon discharge is either to live with J.C., a boyfriend unknown to her daughters and an ex-addict, or with her parents who have proven to be unstable resources for both Dawn and her daughters in the past. Unrefuted qualified clinical witnesses recommended not disturbing the placement of either girl for the foreseeable future. A clear closure to the maternal connection is required if these children — particularly Tasha — are to attain stability of placement, an essential prerequisite to the emotional stability needed if they are to maximize their potential for normal development. No evidence was offered to suggest that either girl would derive any benefit from a continued legal tie with their mother after five years in the uncertainty of foster placement.
Therefore, it is found to be in the best interests of both children for their parents' rights to be terminated so that they may achieve a sense of permanency, hopefully — but not necessarily — in adoption, without the threat, expressed or implied, of being returned to the care of their parents. It is, therefore, ORDERED that the parental rights of Dawn Sn. and Santos R. in the child Chrystal Sa. be, and they thereby are terminated. And it is further ORDERED that the parental rights of Dawn Sn. and Pedro Sa. in and to the child Tasha Sa. be, and they hereby are terminated. It is further ORDERED that the Commissioner of Children and Families be appointed statutory parent for the purpose of securing a permanent home for each of these children, and to assure attainment of this end such Commissioner is ORDERED to submit to this court no later than 90 days following the date of this judgment a written report as to the progress toward such goal. If either child has not been adopted by 8/1/95, such Commissioner is further ORDERED to file Motions To Review Placement of Terminated Child, to be heard by this court no later than 18 months after the date of this judgment.
[Appeal]
Should any parent seek to take an appeal from this judgment, Practice Book Sec. 1059.1, effective 10/1/93, shall CT Page 4332 apply.
Entered at Willimantic this 12th day of April, 1994.
Brenneman, Judge.